[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13762
_____

D.C. Docket No. 9:11-cr-80205-KAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MITCHELL J. STEIN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 13, 2020)

Before LUCK, ED CARNES and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

This is the second time this case has traveled to our Court.  A jury sitting in the Southern District of Florida convicted Mitchell Stein of multiple counts of mail fraud, securities fraud, wire fraud, and money laundering, as well as conspiracy to commit wire and mail fraud and conspiracy to obstruct justice.  In Round I, we affirmed Stein's convictions but remanded with specific instructions to "calculate anew the amount of loss for purposes of" sentencing and restitution.  The case is back before us because Stein claims that the district court did not remedy the original errors found in his sentence.  After review, we conclude that the district court addressed and entirely resolved the issues raised by the previous panel.  Stein also challenges now and for the first time a forfeiture order imposed by the district court, and he attempts to relitigate alleged due process violations that had been rejected by our Court the first time out.  These claims fall far outside of the limited scope of our remand; we will not review them now.  Accordingly, we affirm.

I.

The facts of this case were set forth in detail in a prior published opinion, see United States v. Stein, 846 F.3d 1135, 1140–42 (11th Cir. 2017).  We recite only those necessary to the resolution of this appeal.  Mitchell Stein served as corporate counsel for Signalife, a medical company specializing in manufacturing heart devices. Id. at 1139. Between 2007 and 2008, Stein engaged in fraud by concocting fraudulent purchase orders for heart devices and reporting those sales publicly to

2

investors.  Id.  Thus, for example, Stein drafted a press release which was issued by Signalife in September 2007, touting some $3.3 million in sales.  Id. at 1141.  But those sales were supported by fake orders from fake companies and never occurred.  Id.  Stein later reversed the orders by sending in order cancellations from these bogus companies, and Signalife disclosed the cancellations on August 15, 2008, in its Form 10-Q for the second quarter of 2008.  Id. at 1142.

The Securities and Exchange Commission ("SEC") launched an investigation into Signalife in 2009.  Id.  Following that inquiry, the Department of Justice ("DOJ") conducted a criminal investigation into Stein's activities in 2010.  Id.  A federal grand jury sitting in the Southern District of Florida indicted Stein with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; three counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; three counts of securities fraud, in violation of 18 U.S.C. §§ 1348 and 2; three counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2; and one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 371.  Id.

After a two-week trial, Stein was convicted on all counts.  The district court sentenced Stein to 204 months' imprisonment and two years' supervised release.  It also imposed restitution in the amount of $13,186,025.85 and ordered Stein to forfeit $5,378,581.61.  A portion of the forfeiture order was grounded on the theory of joint

and several liability for the illicit gains of Stein's coconspirator, Martin Carter, who bought and sold Signalife stock at Stein's direction and transferred most (but not all) of the proceeds back to Stein. Id. at 1142.

Stein appealed his convictions and sentence to this Court. He argued that the government knowingly made and allowed several false statements at trial in violation of his due process rights. Id. at 1145–50. Stein also attacked his sentence, claiming that the district court erred in calculating the loss amount of Stein's victims under Sentencing Guideline § 2B1.1(b)(1), and the restitution amount under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.[1] Id. at 1151–56. Stein claimed that both calculations rested on a number of erroneous assumptions and were supported by insufficient evidence. In essence, Stein urged that the government had failed to establish by a preponderance of the evidence that each of Stein's victims relied on the fraudulent information Stein provided. He also argued that the district court failed to consider whether Signalife's stock value had declined at least in part because of factors independent of Stein's fraud, i.e., the short selling of over 22 million shares of Signalife stock and the profound, across-the-board stock market decline in 2008. Id. at 1153–56.

---

[1] The first panel noted, however, that the "method for calculating actual loss, as opposed to intended loss, under the Sentencing Guidelines is largely the same as the method for establishing actual loss to identifiable victims under the MVRA," so it reviewed these claims together. Stein, 846 F.3d at 1153 (quotation omitted). We do so again here.

4

We affirmed Stein's convictions but vacated his sentence. Id. at 1140. We found that the "record contains no direct, individualized evidence of reliance for each investor," and that "the circumstantial evidence in the record is far too limited to support a finding that" every investor "relied on the fraudulent information Mr. Stein disseminated." Id. at 1154. We also agreed that the district court did not "make findings regarding the effects of . . . . intervening events, if any, and whether these events were reasonably foreseeable to Mr. Stein." Id. at 1156. We specifically pointed to the district court's failure to consider "the short selling of over 22 million shares of Signalife stock and the across-the-board stock market decline of 2008." Id. at 1155.

Accordingly, we remanded the case to the district court for the limited purpose of considering evidence of investor reliance and intervening events that may have caused the stock price to decline. Id. at 1156. The scope of our remand was express, narrow and specific: "to calculate anew the amount of loss for purposes of U.S.S.G. § 2B1.1(b)(1) and restitution under the MVRA." Id. Our mandate was clear. We asked the district court to do no more and no less.

On remand, the government submitted expert testimony regarding both investor reliance and the effect of intervening events. The government's expert, Dr. Chyhe Becker, conducted statistical analyses which provided evidence of investor reliance. Dr. Becker also concluded that intervening events did not impact

5

Signalife's stock price. Stein produced his own expert, Dr. Edward O'Neal, who disputed both of these findings. The district court found Dr. Becker to be credible and adopted her methodology. Ultimately, the district court determined that 616 investor victims suffered losses in the amount of $1,029,570. It resentenced Stein to 150 months' imprisonment and three years' supervised release and also ordered him to pay $1,029,570 in restitution.

Stein also challenged on remand, and, notably, for the first time, the district court's $5.4 million forfeiture order. He claimed that the government failed to prove that the amount to be forfeited was traceable to Stein's offenses. And he argued that the portion of the forfeiture order which was based on a theory of joint and several liability was foreclosed by an intervening change in law, relying on Honeycutt v. United States, 137 S. Ct. 1626, 1628 (2017). The district court rejected all of these arguments. Stein had not challenged the forfeiture order on appeal, and the court found no conditions which would "allow a district court to deviate from the appellate mandate" in this case.

Finally, while his first appeal was still pending, Stein had moved in district court for a new trial under Federal Rule of Criminal Procedure 33. In that motion, Stein pressed the same argument he had made on appeal: that the government made or allowed the admissibility of material misstatements in violation of his due process rights under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405

6

U.S. 150 (1972). See Stein, 846 F.3d at 1145–50. Stein claimed that the government made statements during the then-ongoing appeal which amounted to "newly revealed evidence" of due process violations. Almost two years later -- and more than one year after our previous panel rejected Stein's due process claims -- Stein supplemented his Rule 33 motion with a declaration from Thomas Tribou, a customer listed on one of Stein's fraudulent purchase orders. The district court summarily denied the Rule 33 motion.

This timely appeal followed.

## II.

Stein argues now that this Court erred in affirming his convictions three years ago by rejecting the claim that the government knowingly used or relied on false evidence in violation of the Due Process Clause, Brady, and Giglio. For the reasons we detail below, we reject Stein's attempt to reopen this decided question. The mandate rule and the law of the case doctrine bar us from revisiting this claim. As for Stein's newly minted argument about forfeiture, this should have been raised at Stein's initial sentencing in district court and was not, nor was it raised on appeal the first time around. Thus we will not revisit that matter either. As for Stein's claims about the resentencing itself, we are satisfied that the trial court properly addressed our original concerns and affirm its judgment as to the amount of the loss and the restitution order.

As for the calculation of actual loss, Stein says that the evidence was insufficient to establish causation. See Stein, 846 F.3d at 1152 (explaining that the sentencing guideline at issue, U.S.S.G. § 2B1.1, "incorporates and requires both factual or 'but for' causation and legal or foreseeable causation" (quoting United States v. Evans, 744 F.3d 1192, 1196 (10th Cir. 2014))). The trial court's calculation, he argues, was neither sufficiently supported by evidence of reliance (but-for causation), nor did it properly account for intervening events (legal causation).

"The government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct." Id. Moreover, the district court's loss calculation "may be an estimate so long as it is based on reliable and specific evidence rather than mere speculation." Id. at 1156 (quotation omitted). More particularly, "the government must show that the investors relied on Mr. Stein's fraudulent information to satisfy the 'but for' causation requirement." Id. at 1153. "A district court's determination that a person or entity was a victim for purposes of loss calculation is an interpretation of the guidelines, so we review it de novo." Id. at 1151. The government need not offer "individualized proof of reliance for each investor"; rather, the government can "offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." Id. at 1153–54.

After reviewing Dr. Becker's testimony on remand, we are satisfied that the government has met its burden of establishing investor reliance by a preponderance of the evidence.  Among other things, Dr. Becker testified that returns for Signalife stock were 18% higher than would be expected (that is, an abnormal return) on September 25, 2007, when the company issued a fraudulent press release.  And, further, there was an abnormal negative return of -9% on August 15, 2008 -- the date on which Signalife's 10-Q made its order cancellations public.  Moreover, there was an abnormal negative return of -12.7% following an April 2008 conference call during which Signalife failed to provide additional information on pending orders despite having promised to do so.  Dr. Becker also explained that Signalife generated no revenue from 2001 through 2005, and it generated less than $200,000 in revenue in 2006.  She found it likely that the fraudulent purchase orders promising millions in new sales in 2007 would have induced investor reliance, since "investors would have been wondering about overall market demand for Signalife's product."

The district court did not just take the government's word as gospel; it required the government to recalculate its proposed loss amount after removing from consideration those investors who sold their stock before Signalife issued its 10-Q in August.  This recalculation cut the government's proposed loss amount in half, to $1.03 million.  All told, and as we instructed in the earlier opinion, the district court

9

relied on "specific circumstantial evidence" to reasonably conclude that the investors in fact relied on Stein's fraudulent information. Id.

Stein's primary argument on this matter is that Signalife's stock price dropped significantly following an investor call in April 2008. He theorizes that because this drop occurred before Signalife made the order cancellations public in its August 2008 10-Q, the bulk of investor loss was not due to his fraud. Dr. Becker's testimony answered the argument this way: investors were expecting updates on outstanding orders at this April investor call, and Signalife's failure to provide updates created "considerable uncertainty as to whether Signalife would receive any revenue from the false purchase orders." Indeed, Stein's own expert conceded that a company's failure to provide an anticipated update could lead to a corrective drop in stock price.

Stein also claims that the lack of market efficiency for Signalife stock undermines a finding of investor reliance. On this record, we disagree. For one thing, the panel's majority opinion in Round I only required "specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." Id. We did not require the government to establish market efficiency. We add that Stein's expert conducted a statistical study in the past without establishing market efficiency. Even in the

absence of establishing market efficiency, the district court did not err in finding investor reliance.[2]

Next, Stein argues that the district court failed to properly evaluate proximate cause because it did not account for intervening events. A district court's determination of proximate cause "is part of the court's determination of the amount of loss involved in the offense and, thus, is reviewed only for clear error." Id. at 1151. "We will overturn a court's loss calculation under the clear-error standard where we are left with a definite and firm conviction that a mistake has been committed." Id. (quoting United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014)). "There is 'no clear error in cases in which the record supports the district court's findings.'" United States v. Rodriguez, 751 F.3d 1244, 1255 (11th Cir. 2014) (quoting United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002)).

On this record, we can discern no clear error. The prior panel instructed the district court to consider whether "intervening events affected Signalife's stock price during the fraudulent period." Stein, 846 F.3d at 1156. First, in order to quantify the effect of market movements during the 2008 financial downturn, Dr. Becker conducted a statistical analysis which measured any correlation between the market

---

[2] Stein separately argues that the district court erred because it failed to analyze reliance for each of the 616 investors at an individualized level. But the prior panel expressly ruled that the district court need not engage in an individualized analysis "in cases such as this one involving numerous investors," where identifying "individualized proof of reliance for each investor is often infeasible or impossible." Stein, 846 F.3d at 1153.

and Signalife stock.  Dr. Becker explained that "if the market downturn caused Signalife's stock price declines," she "would expect to observe that Signalife's stock price changes were positively correlated with changes in the overall market during that period."  After conducting a number of tests, however, Dr. Becker found that "Signalife's stock price was neither sensitive to changes in the market nor sensitive to changes in its industry during the relevant period," and she concluded that there was "no evidence that Signalife's stock price decline during the relevant period was caused by the market downturn in 2007 and 2008."  The district court accepted Dr. Becker's methodology and found her expert opinion to be "credible and reliable."  Based on her findings, the trial court determined that intervening events did not affect the actual loss figures proposed by the government.  The record supports that finding.

The prior panel also instructed the district court on remand to specifically consider the impact of short sales during the relevant time period, Stein, 846 F.3d at 1156, and on remand, Dr. Becker presented evidence that short sales of Signalife stock were lower than that of the market at large.  Between January and August 2008, one academic study found that, for 350 randomly selected stocks listed on the New York Stock Exchange, short sales represented 39.2% of those stocks' overall trading volume.  Over that same period, however, short sales represented only 26.6% of Signalife's overall trading volume.  Dr. Becker also determined that most of the

12

declines in Signalife's stock occurred during periods of relatively low short-selling activity.  Thus, she concluded that "short selling volume did not have a statistically significant impact on Signalife's stock price during the relevant period."

Stein's arguments to the contrary are without merit.  He claims that the district court "did not address" intervening events at all, and that "the district court ignored . . . extensive defense evidence concerning the effect of short-selling and the 2008 stock market decline on the price of Signalife stock."  The record tells a different story.  First off, the district court recognized that it had to take intervening events into account; it said that its loss calculation was based on the "inflated value of [Signalife's] stock attributable to the fraudulent misrepresentations."  The district court was engaged throughout Stein's resentencing hearing, repeatedly inquiring about the mechanics of short selling.  The resentencing hearing also featured extensive discussion about the financial downturn of 2008 and the use of various methodologies to control for its effect on stock prices.  After considering this evidence, the district court reasonably credited Dr. Becker's testimony and adopted her methodology, again describing both as "credible," "competent," and "reliable."

Stein's argument boils down to the claim that the district court should have credited his own expert and rejected the opinion of Dr. Becker.  Our case law, however, is unambiguous: the district court frequently must choose between dueling experts, and if that decision is reasonably based on evidence found in the record, the

13

choice is not clear error.  See Knight v. Thompson, 797 F.3d 934, 942 (11th Cir. 2015) (allowing the district court to "weigh competing expert testimony" so long as it does "not arbitrarily ignore" either expert); Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000) ("When there is conflicting testimony by expert witnesses, as here, discounting the testimony of one expert constitutes a credibility determination, a finding of fact.").  The district court reasonably relied on evidence and analysis provided by Dr. Becker, a qualified expert who had earlier served as the acting division director and chief economist of the SEC's Division of Economic and Risk Analysis.  There was no clear error in choosing to rely on Dr. Becker.  Thus we affirm the district court's calculation of loss.[3]

## III.

Stein's remaining due process and forfeiture claims fall outside the scope of the limited remand in this case.  The district court properly rejected them.  We start with hornbook law: "A trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review,

---

[3] Stein makes one additional argument: his expert testified that the August 15 10-Q affected losses stemming from the fraud because this disclosure included the fact that there was a large quarterly loss, and that Signalife for the first time reported negative stockholder equity.  Stein's expert thus reduced the losses attributable to fraud by two-thirds, but he admitted he had "no basis" for that figure.  The government convincingly argued that these pieces of negative news were inherently tied to the fraud and were not properly considered intervening.  Signalife was forced to back out $5 million in fraudulent sales due to order cancellations, and it is not surprising that reversing $5 million in revenue would lead to a negative impact on the company's balance sheet.  Again, the district court did not clearly err by rejecting Stein's argument.

but must enter an order in strict compliance with the mandate." Piambino v. Bailey, 757 F.2d 1112, 1119 (11th Cir. 1985); see also United States v. Tamayo, 80 F.3d 1514, 1520 (11th Cir. 1996) ("[A] district court when acting under an appellate court's mandate, 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" (quoting Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1510–11 (11th Cir. 1987) (en banc))). The only remaining question is whether Stein can establish any exceptions to this basic rule. He has not done so.

### A.

Starting then with Stein's due process claim, the prior panel had already heard and squarely rejected Stein's argument that the government knowingly relied on false testimony. Stein, 846 F.3d at 1147–50. Stein's request for additional review falls outside of our limited mandate and is barred by the law of the case doctrine, which "operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1291 (11th Cir. 2005) (per curiam). There are only three exceptions to this doctrine: if "(1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to

15

the issue, or (3) the previous decision was clearly erroneous and would work a manifest injustice." Westbrook v. Zant, 743 F.2d 764, 768–69 (11th Cir. 1984).

Stein first offers what he characterizes as new evidence of government wrongdoing, and claims the first exception to the law of the case doctrine. But the only new evidence he references in this appeal -- a declaration by Signalife customer Thomas Tribou -- was submitted in a "supplement" to his original Rule 33 motion for a new trial. That supplement was submitted nearly two years after Stein's motion (and five years after the verdict). A motion under Rule 33 based on new evidence must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1). Tribou's declaration was untimely. Stein has pointed us to no explanation for his tardiness, nor can we construe this late filing to be "linked" to the original motion, as Stein urges. Allowing new evidence to be shunted into an old Rule 33 petition at any time simply by calling it a "supplement" would eviscerate the prescribed period for making such filings. The district court did not err in denying Stein's new trial motion based on evidence found within the supplement.

But even if we were to consider the contents of this supplement, and even if the evidence within it were newly discovered, we would conclude that this "new evidence" is immaterial. In his declaration, Tribou avers that he paid Signalife for goods he expected to receive. But the parties already stipulated to that fact at trial. The declaration does not speak to the government's theory of the case: that Stein

16

fabricated details within the purchase orders at issue. Indeed, Tribou concedes in his declaration that the order form he filled out remained "blank except for the number of units and the cost." The declaration does not contradict the government's theory that Stein supplied phony order details.

Stein also claims that the prior panel clearly erred when it rejected his due process claim, and that this result would work a manifest injustice, qualifying him for the third exception to the law of the case doctrine. Westbrook, 743 F.2d at 768–69. Stein argues it was clear error to require a showing that the government suppressed evidence or capitalized on false testimony in order to prevail on a Giglio claim.

We disagree. For most of the statements at issue, the panel could not find sufficient evidence that the government knowingly relied on false testimony in the first place. Stein, 846 F.3d at 1150. For the small subset of statements that remain, the panel determined, after citing to our binding precedent, that Stein failed to show how the government either suppressed or capitalized on allegedly false testimony. Id. This conclusion was not clearly erroneous.

All told, Stein has pointed us to no new evidence or law, nor has he established that the panel's rejection of his due process claims was clearly erroneous or manifestly unjust. The law of the case doctrine applies. There was no basis for the

district court to consider the issue on remand, and no grounds for us to reconsider the matter today.

## B.

Finally, Stein says that the district court's forfeiture order is improper. He claims that the entire forfeiture calculation was unsupported by the evidence, and also that a subset of the order relying on the theory of joint and several liability is invalid in light of Honeycutt v. United States, 137 S. Ct. 1626 (2017). Stein failed to make these arguments before the district court during his original sentencing, nor did he raise them on his initial appeal with this Court. But he argues, nevertheless, that he has preserved these claims because the district court entered an amended judgment on remand; thus, the court was free to reconsider all sentencing issues from scratch.

We disagree. Stein misapprehends the basic goal of the mandate rule: to discourage precisely this type of inefficient, piecemeal litigation. See, e.g., Litman, 825 F.2d at 1511 (explaining that the doctrine "operates to create efficiency, finality and obedience within the judicial system"). As we have emphasized, when "the appellate court issues a limited mandate," the district court "is restricted in the range of issues it may consider on remand." United States v. Davis, 329 F.3d 1250, 1252 (11th Cir. 2003) (per curiam); see also United States v. Mesa, 247 F.3d 1165, 1170–71 (11th Cir. 2001) (concluding that an argument regarding a downward sentencing

adjustment fell outside the scope of remand, because the limited mandate "did not vacate [the defendant's] sentence in its entirety").

The remand here was limited, and those limitations were expressed clearly. We determined that the district court erred in only two respects, both specific to its calculation of loss: it leaned on insufficient proof of reliance, and it failed to determine whether intervening events caused Signalife's stock to drop. Stein, 846 F.3d at 1140. We remanded "so that the district court can remedy these errors," and we provided specific "instructions to calculate anew the amount of loss for purposes of U.S.S.G. § 2B1.1(b)(1) and restitution under the MVRA." Id. at 1140, 1156 (emphasis added).

Yet Stein attacks the forfeiture order, which is unrelated to recalculation of the loss amount. Because his claim plainly falls outside the scope of our limited remand, and because he failed to raise this issue in his first appeal, the law of the case doctrine applies to this claim as well. See Piambino, 757 F.2d at 1120 ("The 'mandate rule,' as it is known, is nothing more than a specific application of the 'law of the case' doctrine."). As we have explained:

> While the law-of-the-case doctrine has several arms, the only one relevant here deals with lower court rulings that have not been challenged on a first appeal . . . . [A] legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

19

United States v. Escobar-Urrego, 110 F.3d 1556, 1560 (11th Cir. 1997) (citation and quotation omitted); see also Mesa, 247 F.3d at 1171 n.6 ("Had [the defendant] raised this issue in his first appeal, he might have been entitled to some measure of relief on 'plain error' review. By failing to appeal the question at that time, he, however, abandoned this argument. And the district court, on remand, was not required to consider it when our mandate did not require a de novo resentencing.").

The law of the case doctrine thus applies to Stein's previously unraised forfeiture argument attacking the entirety of the order, and none of the narrow exceptions to the doctrine apply to this claim. Nothing prevented Stein from raising this claim in district court at his original sentencing. He could have raised the claim before our Court, too, during his first appeal, subject to plain error review. He points to no new evidence or law that would excuse his failure to raise the issue, nor to any clear error or manifest injustice. Since no exception to the law of the case doctrine can be found, no reversible error is presented by the trial court's refusal to grant Stein's late argument. See Mesa, 247 F.3d at 1171.

Stein's argument attacking joint and several liability fares no better. Stein points us to the Supreme Court's decision in Honeycutt v. United States as an intervening change in law that justifies setting aside that portion of the forfeiture order. Again, we are unpersuaded. Not just any change in law qualifies as an exception to the law of the case doctrine. Rather, we demand an "intervening change

in the controlling law" that "dictates a different result." Grayson v. Warden, Comm'r, Ala. DOC, 869 F.3d 1204, 1231 (11th Cir. 2017) (quoting Piambino, 757 F.2d at 1120). Honeycutt does not fit this bill.

Honeycutt dealt with 21 U.S.C. § 853, a forfeiture statute specific to drug crimes. Section 853 allows for the forfeiture of drug-related proceeds which "the person obtained, directly or indirectly." 21 U.S.C. § 853(a)(1). The Supreme Court found joint and several liability inappropriate under § 853 largely because of the requirement that the defendant "obtain" the proceeds; as the Court explained, "[n]either the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else." Honeycutt, 137 S. Ct. at 1632.

By contrast, the forfeiture statutes at issue here, 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), are not related to drug crimes, nor do they use the word "obtain." Further, unlike § 853's focus on proceeds "the person" obtained, these statutes reference more broadly the proceeds or property "traceable to a violation" or "involved in [an] offense." 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1). Given these differences, and understanding the importance that the Supreme Court placed on language specific to § 853 in reaching its conclusion, we cannot say that Honeycutt qualifies as an intervening change in law that dictates a result for the statutes here.

21

Rather, all that Honeycutt dictates for our purposes is to undertake a close examination of the text when confronted with a question of statutory interpretation. We certainly agree with that premise. But those same tools of interpretation that the Supreme Court used in Honeycutt were available to Stein long before that decision was published. Honeycutt was not an intervening change in law in that respect; it "was simply a matter of statutory interpretation" that "did not announce a new constitutional right or overturn any Supreme Court precedent." United States v. Bane, 948 F.3d 1290, 1297 (11th Cir. 2020). Stein could have just as easily advocated against joint and several liability in the same way Honeycutt found persuasive: by urging "an interpretation of a statute that is consistent with its ordinary meaning and structure." Id. Honeycutt's use of interpretive techniques specific to language in § 853 does not amount to an intervening change in controlling law that dictates a result with respect to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).

**AFFIRMED.**